FILED
2026 Mar-03 PM 12:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEANETTA STRICKLAND,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:24-cv-01468-RDP** |
| | } | |
| **VULCAN MATERIALS COMPANY, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Before the court is Defendant Vulcan Materials Company, Inc.'s Motion for Summary Judgment. (Doc. # 15). The Motion has been fully briefed. (Docs. # 17, 22, 24). After careful review, and for the reasons discussed below, the Motion is due to be granted.

## I.      Background[1]

Plaintiff Jeanetta Strickland ("Plaintiff") is an African-American woman over 60 years of age. (Doc. # 16-3 at 23:18, 71:8-9). Defendant Vulcan Materials Company ("Vulcan") produces construction materials for roads, buildings, and other infrastructure. (Doc. # 16-1 at 7:6-19).

Plaintiff began working for Vulcan around May 1996 as an Accounts Payable Clerk. (*Id.* at 28:1-15; Doc. # 16-4). In April 2010, Plaintiff was promoted to Dedicated Buyer for the Southern and Gulf Coast Division ("SGC") and moved to the Procurement Department. (Docs. # 16-3 at 32:21-33:5, 35:20-22; 16-5). The Procurement Department's goal is to save Vulcan money by purchasing the best materials at the lowest possible price. (Doc. # 16-3 at 35:14-19).

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

As a Dedicated Buyer, Plaintiff was responsible for meeting with suppliers, visiting Vulcan's plants, running spend reports, negotiating contracts, and identifying commodities that Vulcan could purchase at a cost savings. (*Id.* at 35:8-19). Plaintiff was promoted to Dedicated Buyer II around April 2017, and again to Senior Buyer around October 2018. (*Id.* at 38:20-40:21, 55:24-57:15). The size of the projects Plaintiff worked on changed with these promotions, but she was not responsible for managing direct reports. (*Id.* at 122:18-24; 16-8 ¶ 8). Other than occasionally filling in for her manager or assisting with projects, Plaintiff had no prior management experience. (Docs. # 16-3 at 51:20-55:23, 121:25-122:24; 16-2 at 45:2-9). On June 1, 2022, Plaintiff applied for and received a promotion to the position of Sourcing Lead. (Docs. # 16-3 at 44:14-17; 16-9 at ¶ 5; 16-8 ¶ 4). Sourcing Specialists and Sourcing Leads, like Plaintiff, needed to build and maintain strong relationships with plant leadership. (Docs. # 16-3 at 124:13-24; 16-9 ¶ 3).

### A. Following a departmental restructuring, Plaintiff's supervisors identified performance concerns.

After Plaintiff's promotion to Sourcing Lead, Vulcan began redesigning the structure of its Procurement Department, beginning with the hiring of Thiago Simoes as Director of Regional Sourcing (also known as Director of Procurement) in summer 2022. (Doc. # 16-9 ¶ 2). The purpose of this redesign was to shift administrative duties back to the plants and shift the department's focus to strategic sourcing. (Docs. # 16-3 at 130:5-132:16; 16-10; 16-1 at 63:17-64:3; 16-9 at ¶ 3).

Around December 2022, Vulcan posted an opening for Procurement Operations Support Team ("POST") Manager for the SGC/Central Division, which covered Alabama, Tennessee, Kentucky, and Illinois. (Docs. # 16-9 at ¶ 6; 16-12 at ¶ 2). Jeff Chisolm, the candidate selected for the position, had ten years of prior management experience, including six years in

management at Vulcan. (*Id.* at 51:19-23, 58:6-15, 144:12-145:12). In early 2023, after Chisolm became POST Manager, Simoes asked Chisolm to give Plaintiff an opportunity to take a lead role in managing the Alabama plants under Chisolm's direct supervision with the aim of helping Plaintiff work toward a future management position. (Docs. # 16-14 at 66:8-21, 67:3-9; 16-9 ¶ 7).

Shortly after Chisolm began managing Plaintiff, he observed that her performance failed to meet his expectations. (Doc. # 16-14 at 131:12-16). Chisolm documented Plaintiff's performance on a quarterly basis on what Vulcan calls a "performance dialogue," and he regularly discussed Plaintiff's performance with her. (Docs. # 16-3 at 138:8-16; 16-16). In April 2023, Chisolm counseled Plaintiff on her failure to engage with plant and area managers. (Docs. # 16-3 at 138:17-138:20; 16-16). Chisolm also had discussions with Plaintiff regarding the need to identify projects to comport with the department's new focus on strategic analysis. (Doc. # 16-16).

Plaintiff was also asked to coach and mentor Cindy Giambrone, a Sourcing Specialist, on projects in Alabama. (Docs. # 16-14 at 66:8-21; 16-9 ¶ 8). Giambrone complained to Chisolm that Plaintiff gave her a list of projects to work on without any details, explanation, or training to properly execute them. (Doc. # 16-19 at ¶ 5). In Plaintiff's 2023 Q2 performance dialogue, Chisolm again documented that her performance needed improvement because she was not developing sourcing projects on her own, not coaching Giambrone, and not fully engaged with Vulcan's plants. (Docs. # 16-3 at 141:11-142:9; 16-16).

**B.    Plaintiff was mistakenly copied on an internal email criticizing her upcoming presentation.**

In June 2023, Simoes asked Plaintiff to prepare and lead a presentation regarding the state of procurement operations in Alabama. (Docs. # 16-3 at 250:22-251:2; 16-14 at 79:7-16).

Shortly after, Chisolm sent Simoes an email stating that the presentation would "expose" Plaintiff. (Docs. # 16-3 at 253:2-11; 16-14 at 81:5-23; 16-11 ¶ 4). Plaintiff was mistakenly copied on the email. (*Id.*). As a result, Plaintiff complained to Darren Hicks, Vulcan's Chief Human Resources Officer. (*Id.*) In her declaration, Plaintiff states that she told Hicks that she "knew Chisolm had been the subject of complaints about hostile working conditions from another black female" and that she was "concerned about the tone of [her] early interactions" with Chisolm. (Doc. # 21-1 ¶¶ 3, 5-6). According to Plaintiff, Hicks responded that "he would look into the matter." (*Id.*).

After Plaintiff's complaint, Nichole Oliver, Vulcan's Director of Human Resources, counseled Chisolm about the email and instructed him to (1) apologize to Plaintiff and (2) be frank with Plaintiff about his concerns with her presentation. (Doc. # 16-1 at 25:13-26:5, 129:9-130:15). Oliver did not speak directly with Plaintiff about her reaction to the email. (Doc. # 16-1 at 20:22-21:6).

After the email incident, Chisolm met with Plaintiff and explained to her that he felt her performance deficiencies would be exposed during the presentation because she was not developing strategic, cost-saving projects. (Docs. # 16-3 at 269:16-23; 16-14 at 85:2-4, 86:17-22, 88:4-18; 16-17 at 2-3). Chisolm admits that the email was offensive, and he did not intend for Plaintiff to see it. (Doc. # 16-14 at 82:6-10, 84:9-10, 85:12-19).

### C.    Plaintiff's handling of negotiations with a Fort Payne vendor created conflict with supervisors.

In October 2023, Plaintiff attended a meeting in Fort Payne with Simoes and multiple area managers to discuss Vulcan's relationship with a key vendor. (Docs. # 16-3 at 154:18-155:13, 156:7-17; 16-9 ¶ 9). After everyone proposed ideas on how to approach the relationship with the vendor, Plaintiff informed the group that she was already in negotiations with the

vendor to obtain a 5% discount. (Docs. # 16-3 at 156:7-158:6; 16-9 ¶ 9; 16-11 ¶ 7). Plaintiff's announcement created tension with operations because the department had not yet authorized negotiations with the vendor. (*Id.*). Simoes was upset that she announced the negotiations at the meeting before aligning herself with the appropriate stakeholders. (Docs. # 16-3 at 160:14-20; 16-11 ¶ 8; 16-23).

On October 10, 2023, after a meeting with Chisolm and Simoes to discuss the issues with how she handled the Fort Payne vendor negotiation, Plaintiff emailed Hicks and said that, based on the meeting in Fort Payne and the issues with the vendor negotiation, she thought Simoes wanted to fire her. (Docs. # 16-3 at 153:25-154:17, 158:7-15; 16-24).

### D.   Plaintiff continues to receive performance counseling while also raising concerns to Human Resources.

On October 13, 2023, as part of her 2023 Q3 performance dialogue, Chisolm again coached Plaintiff that her performance needed to improve. He continued to note issues she had with identifying projects, coaching Giambrone, and remaining engaged with Vulcan's plants. (Docs. # 16-3 at 144:6-146:11; 16-16; 16-25 at 1-24).

After the meeting, Plaintiff emailed Hicks and claimed that Chisolm told her that her job was on the line and that there were other "older" procurement employees whose jobs were on the line because of their "old way of thinking." (Docs. # 16-3 at 208:13-209:22; 16-23). She alleged that she was being subjected to "discrimination, conspiracy, bullying, and retaliation." (Docs. # 16-13 at 163:6-164:16; 16-23). Plaintiff later stated in her deposition that she "felt as though [she] was the only one that they were treating this way" because she was "the only black female in the group." (Doc. # 16-3 at 163:6-13). After emailing Hicks, Plaintiff had an additional conversation with Hicks to discuss her concerns. (Doc. # 16-3 at 164:17-22).

That same day, Chisholm emailed Oliver, Simoes, and Joel Barber, Human Resources Manager for SGC/Central, to express his concerns about Plaintiff's performance. (Docs. # 16-1 at 127:17-128:15; 16-11 ¶ 10). In his deposition, Chisolm testified that he did not recall making the exact statements Plaintiff claims he made but did recall "telling [Plaintiff] that the old way of thinking was problematic given Vulcan's recent changes in the Procurement Department." (Docs. # 16-14 at 105:12-106:13; 17 at 22).

Also around mid-October, Hicks informed Oliver that Plaintiff felt her performance was not being fairly evaluated. (Doc. # 16-1 at 34:22-35:6, 39:14-40:8). So, Hicks asked Oliver to oversee the performance management process for Plaintiff. (*Id.*) Vulcan's EEOC position statement explains that, in October 2023, after Plaintiff "complained to Hicks that she was being treated unfairly," "Hicks discussed this issue with [Plaintiff], Chisolm, . . . and Nichole Oliver, Director of Human Resources." (*Id.*). Hicks did not tell Oliver that Plaintiff complained about discrimination, retaliation, or Chisolm's comments. (*Id.* at 38:2-14). Hicks also did not show Oliver the October 13 email from Plaintiff. (*Id.*).

The court notes that Darren Hicks passed away in February 2025, and his testimony is therefore unavailable. *See Remembering Darren Hicks*, Vulcan Materials Co., https://www.vulcanmaterials.com/about-us/our-culture/remembering-darren-hicks (last visited February 11, 2026). Chisolm testified that he "never had a formal conversation with" Hicks or had a conversation with Hicks about Plaintiff. (Doc. # 16-14 at 89:22-90:19). Simoes testified that he never knew Plaintiff complained to Hicks that she did not get promoted because she was a black woman, and that Plaintiff never communicated that belief to him. (Doc. # 16-38 at 78:13-79:2). Further, Simoes testified that neither Hicks nor Oliver told him of Plaintiff's October 2023 complaints of discrimination. (*Id.* at 114:12-115:17; 133:7-20). Finally, Oliver testified that the

only conversation she recalled with Hicks about Plaintiff in the June 2023 time period related to Plaintiff's performance. (Doc. # 16-2 at 22:1-23). Oliver further testified that she began assisting with Plaintiff's performance evaluations after Plaintiff complained to Hicks in October 2023, but Oliver did not understand what Plaintiff thought was "unfair" about her evaluations and did not have a conversation with Plaintiff about it. (*Id.* at 34:17-35:13). Oliver was never shown a copy of the October 2023 email to Hicks and had "no knowledge of [Plaintiff] making a retaliation complaint." (*Id.* at 38:2-7; 74:12-23).

In the late October to November 2023 time frame, Vulcan decided to limit the scope of Plaintiff's role to the Birmingham metropolitan area. (Docs. # 16-3 at 165:6-166:3; 16-11 ¶ 12; 16-14 at 111:4-20). Plaintiff was told that her territory was limited to decrease her workload and to allow her to better manage her territory. (*Id.*). Also, Giambrone accepted a position working in another department at Vulcan, which meant she no longer assisted Plaintiff with her territory. (Doc. # 16-11). Ladair Tinker, another Sourcing Specialist, absorbed the Alabama plants that were removed from Plaintiff's territory. (Docs. # 16-3 at 220:15-18; 16-8 ¶ 6; 16-11 ¶ 12). Also, at some point in late October 2023, Simoes explored transferring Plaintiff to another division in the company but ultimately decided against it. (Docs. # 16-38 at 137:1-22, 144:3-23; 21-4).

### E.    Plaintiff is placed on a performance improvement plan to address ongoing deficiencies.

In January 2024, with input from Oliver and Chisolm, Simoes placed Plaintiff on a performance improvement plan ("PIP"). (Docs. # 16-4 at 167:20-168:9; 16-26; 16-38 at 150:7-12). Before placing Plaintiff on the PIP, Simoes prepared a performance analysis comparing Plaintiff's performance to her peers' performance for Oliver's review. (Docs. # 16-9 ¶ 15; 21-6). Simoes testified that the analysis shows that, although Plaintiff ranked roughly in the middle of her peers on certain raw value-generation dollar metrics and had a relatively high figure in the

"other" category (which was driven largely by scrap-related projects), her overall performance rating was much lower because the evaluation measured more than just numerical results. (Doc. # 16-38 at 166:9-173:14). He explained that approximately half of the assessment focused on behavioral and operational factors, including credibility, reporting discipline, risk management, field presence, analytics capability, collaboration, leadership of sourcing activities, and adherence to company processes. (*Id.*) In those other areas, Plaintiff consistently scored poorly compared to her peers, and that drove her overall score down. (*Id.*). Thus, even though Plaintiff outperformed some sourcing leads in isolated value-generation categories, Vulcan's overall metrics still placed her performance "far below" other senior team members. (Doc. # 21-6). Her total performance score of 19% was the lowest on the team, with the next lowest score at 69%, a gap of approximately 50 percentage points. (*Id.*).[2]

The PIP was set to last from January 8, 2024 until March 8, 2024. As part of the PIP, Plaintiff, Oliver, and Chisolm met regularly, usually weekly or bi-weekly, to discuss Plaintiff's progress. (Docs. # 16-3 at 173:2-10; 16-14 at 116:21-117:5). Simoes attended the PIP meetings when he was available. (Doc. # 16-1 at 70:14-18). Oliver also had one-on-one meetings with Plaintiff at various times throughout the PIP process. (*Id.* at 69:13-70:13, 147:7-14). As her supervisor, Chisolm was primarily responsible for determining Plaintiff's success in completing the metrics of the PIP. (Doc. # 16-38 at 159:14-17).

Plaintiff's PIP detailed six areas of concern: field presence, communication, 7-step strategic sourcing process, project pipeline creation & execution, data driven orientation, and risk

---

[2] There were also performance concerns regarding Chisolm. But, only Plaintiff was placed on a PIP. (Doc. # 16-38 at 191:1-2). Simoes testified that he had concerns about Chisolm's "relationship[s] within the company," while also noting that negative feedback was common and that even Simoes himself received such criticism. (Doc. # 16-38 at 188:4-23). Simoes further clarified that this feedback was not specific to Chisolm but was instead "overall" feedback directed at the department as a whole. (*Id.*).

management. (Doc. # 16-26). There were also nine areas for improvement: spending a minimum of two days per week on average in the field, completing her Mine Safety and Health Administration ("MSHA") certification, visiting all plants in her footprint, identifying and scoping a 7-step project, executing a project using the 7-steps method, developing a project pipeline, engaging in risk management during negotiations, completing the negotiations with the Fort Payne vendor for a 5% discount, and improving communication with stakeholders. (*Id.*). Plaintiff acknowledged "failure to improve within the specified areas up to an acceptable standard may lead to further corrective action." (*Id.*). However, she was never told that any one aspect of the PIP was decisive in evaluating whether she satisfied the PIP. (Doc. # 16-14 at 124:21-126:9).

Under Plaintiff's job description and PIP requirements, she was responsible for "execution of the end-to-end 7-step procurement process from need identification through contract for regional spend." (Docs. # 16-3 at 127:2-129:4; 16-32). Her PIP required Plaintiff to complete the 7-step project by March 8, 2024. (Doc. # 16-26).

Chisolm authorized Jack Lynch, a Sourcing Specialist, to help Plaintiff with her 7-step project. (Doc. # 16-3 at 178:14-179:24). Lynch was not a Sourcing Lead like Plaintiff and had been employed by Vulcan for less than two years. (Doc. # 16-8 ¶ 6). Before the 7-step project presentation, Plaintiff complained to Chisolm that Lynch had not provided the information she requested, but she did not take steps to independently obtain the missing data. (Doc. # 16-3 at 180:9-181:17, 185:14-188:17). As the Sourcing Lead, Plaintiff was ultimately responsible for completing the project. (Docs. # 16-1 at 85:8-21; 16-33 ¶ 5). Plaintiff acknowledged that she was responsible for "most of" the project and the "vast majority" of the PowerPoint slides used in the presentation of the project. (Doc. # 16-3 at 186:7-187:5).

On March 8, 2024, Plaintiff presented her 7-step project to Chisolm and Oliver during her final PIP meeting, which Plaintiff recorded. (Docs. # 16-3 at 182:20-184:11; 16-34; 16-35 at 1-25). Of the 49 slides in the PowerPoint presentation, 23 were incomplete or marked as in progress. (Doc. # 16-34). Plaintiff does not know whether she ever completed the project and does not have a copy of a more complete presentation.[3] (*Id.* at 197:12-23). Chisolm and Oliver observed that Plaintiff was unable to adequately answer questions about the presentation or explain her findings. (Docs. # 16-1 at 136:17-138:14; 16-14 at 121:17-122:4; 16-35).

Plaintiff also failed to meet other PIP requirements. For example, she was instructed to cancel a cleaning services contract for one of her plants effective December 2023, but Chisolm learned in March 2024 that the contract had not been canceled. (Docs. # 16-3 at 199:19-202:7; 16-36). Plaintiff also failed to fully negotiate the 5% discount with the Fort Payne vendor as required: she secured the discount for only some services but never obtained a written agreement. (Docs. # 16-3 at 162:16-24, 169:22-170:12, 221:8-222:23; 16-22; 16-31 at 1-2). In addition, Plaintiff did not visit any plants in February 2024 and, during the PIP period, a manager complained to Chisolm that Plaintiff failed to communicate with him regarding the arrival of an order. (Docs. # 16-3 at 202:8-203:20, 212:9-213:10; 16-27; 16-28 at 4-5; 16-29 at 2-3; 16-33 ¶¶ 7-10).

**F.    Vulcan terminates Plaintiff's employment in March 2024 after concluding she did not meet PIP expectations.**

Plaintiff's employment was terminated effective March 25, 2024. (Docs. # 16-1 at 75:7-13, 79:17-80:16; 16-14 at 121:9-16; 16-37 at 1-4; 16-38 at 186:2-9). Her position was not filled following her termination. (Doc. # 16-11 ¶ 13). Instead, Chisolm assumed responsibility for

---

[3] Simoes testified that Plaintiff's 7-step project was never completed, even after Plaintiff was terminated, because the employees involved left the company, the team was already fully loaded with higher-priority work, and the project was placed in a backlog pipeline without anyone available to take it over. (Doc. # 16-38 at 165:23-166:8).

Plaintiff's plans, with Tinker assisting as needed in the SGC territory. (*Id.*). At the time of Plaintiff's termination, Simoes, Chisolm, and Oliver were unaware that Plaintiff had made any complaints of discrimination or retaliation. (Docs. # 16-1 at 74:12-23; 16-2 at 102:8-16, 114:6-15; 16-3 at 199:7-14, 214:24-215:1, 217:20-218:1; 16-9 ¶ 18; 16-14 at 44:8-45:20, 46:5-47:20).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of a material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'What we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'") (citations omitted).

## III.    Discussion

Plaintiff's Complaint alleges four causes of action against Vulcan. However, one of those claims fails based on Plaintiff's own concession. Plaintiff concedes that "the development of the evidence does not [support] a failure to promote race discrimination claim." (Doc. # 22 at 3 n.1). Accordingly, the court addresses Plaintiff's three remaining claims: (1) Retaliatory hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-3(a); (2) Retaliatory hostile work environment in violation of 42 U.S.C. § 1981; and (3) Discriminatory termination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1). (Doc. # 1 at 11-16).

### A.    Plaintiff's Retaliatory Hostile Work Environment Claims

Plaintiff's retaliation claims, asserted under Title VII and § 1981, are governed by the same analytical framework. *Berry v. Crestwood Healthcare LP*, 84 F.3d 1300, 1309 (11th Cir. 2023). Because retaliation claims under Title VII and § 1981 are governed by the same analytical framework, the claims necessarily rise or fall together. *Id.*; *see CBOCS W., Inc. v. Humphries*,

553 U.S. 442, 452-57 (2008); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020).

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Section 1981 "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (citation omitted).

To succeed on her retaliatory hostile work environment claim, under Title VII and § 1981, Plaintiff must show that: (1) Plaintiff engaged in protected activity, (2) after doing so, Plaintiff was subjected to unwelcome harassment, (3) the harassment was based on her engaging in the protected activity, and (4) the harassment well might have dissuaded a reasonable worker from engaging in protected activity. *Monaghan v. Worldpay Inc.*, 955 F.3d 855, 861-62 (11th Cir. 2020); *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006); *Baroudi v. Sec'y, Dep't of Veterans Affairs*, 616 F. App'x 899, 904 (11th Cir. 2015) (per curiam); *Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012). Additionally, a plaintiff must show that the employer is responsible for the hostile work environment under a theory of either direct or vicarious liability. *Jones v. City of Lakeland*, 318 F. App'x 730, 735 (11th Cir. 2008) (per curiam).

### 1. Plaintiff engaged in protected activity

"Internal complaints to supervisors are statutorily protected activity." *Moore v. Pool Corp.*, 304 F. Supp. 3d 1148, 1163 n.15 (N.D. Ala. 2018) (citing *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001)). "Title VII's protections are not limited to

individuals who file formal complaints but extend to those who voice informal complaints as well." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citation omitted).

Plaintiff's Complaint alleges that she engaged in "statutorily protected activity under Title VII [and § 1981] by making internal complaints of racially discriminatory promotional practices in or about June 2023." (Doc. # 1 ¶¶ 46, 51). It is undisputed that, in June 2023, Plaintiff complained to Darren Hicks, Vulcan's Chief Human Resources Officer, after she was mistakenly copied on an email from Chisolm to Simoes stating that a presentation on procurement operations in Alabama would "expose" her. (Docs. # 16-3 at 253:2-254:3; 16-11 ¶ 4; 16-14 at 81:5-23). In her declaration, Plaintiff stated that she told Hicks that she "knew Chisolm had been the subject of complaints about hostile working conditions from another black female" and that she was "concerned about the tone of [her] early interactions" with Chisolm. (Doc. # 21-1 ¶¶ 3, 5-6). According to Plaintiff, Hicks responded that "he would look into the matter." (*Id.*). Thus, because Plaintiff made internal, informal complaints to a supervisor, for summary judgment purposes, the court finds she has made a sufficient showing that she engaged in a protected activity. *Moore*, 304 F. Supp. 3d at 1163.

Plaintiff also emailed Hicks raising concerns about a performance review in October 2023 and complaining about the administration of her performance improvement plan in February 2024. (*See* Docs. # 16-3 at 163:6-164:16; 16-23; 21-1 ¶ 3). In her October 2023 email to Hicks, Plaintiff specified that Chisolm told her that her job was "on the line" and that she believed that Chisolm and Simoes were subjecting her to "discrimination, conspiracy, bullying, and retaliation." (Doc. # 16-23). Plaintiff also stated in her deposition that she "felt as though [she] was the only one that they were treating this way" because she was "the only black female in the group." (Doc. # 16-3 at 163:6-13). While Vulcan contends that the October 2023 email

was not protected activity because the email "does not mention race" (Doc. # 17 at 18), the court finds that Plaintiff's other complaints to Hicks, as well as the contents of the October 2023 email itself, are sufficient to raise a genuine issue of fact about whether Plaintiff engaged in protected activity.

### 2.    Whether Plaintiff was subjected to unwelcome harassment

Plaintiff's Complaint alleges that the unwelcome harassment included "a denial of a promotional opportunity in September 2023, a reduction in the scope of her job responsibilities, a failure to investigate her repeated complaints of discrimination, placement on a performance improvement plan and her eventual termination." (Doc. # 1 ¶¶ 47, 52). It is generally undisputed that Plaintiff was not promoted, had her job responsibilities reduced, was placed on a PIP, and eventually was terminated. (*See generally* Docs. # 17, 22, 24). Accordingly, the court proceeds to the next two elements of Plaintiff's retaliatory hostile work environment claim to determine whether Plaintiff has presented sufficient evidence for a reasonable factfinder to conclude that the alleged harassment was based on Plaintiff engaging in protected activity and enough to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68.

### 3.    Whether the harassment was based on Plaintiff engaging in protected activity

The causal link element for a *prima facie* case is construed broadly. A plaintiff must establish "the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). "As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020); *see also Shannon v. Bellsouth*

*Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002); *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). Awareness of protected activity can be established through circumstantial evidence. *Martin*, 959 F.3d at 1053.

Plaintiff contends that this court should infer that Chisolm, Simoes, and Oliver knew of Plaintiff's discrimination complaints. In support of this argument, she cites *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). (Doc. # 22 at 14-17). In *Goldsmith*, the plaintiff sued the City of Atmore for Title VII retaliation after the plaintiff told a city councilman that she planned to investigate filing an EEOC complaint and was transferred three weeks later. *Goldsmith*, 996 F.2d at 1162-63. The City of Atmore argued that it was entitled to judgment as a matter of law because the plaintiff's evidence was insufficient to establish the "causal link" between the plaintiff's protected statement and her transfer. *Id.* at 1163. The Eleventh Circuit disagreed and found that the evidence was sufficient to satisfy the plaintiff's initial burden to show a "causal link" because, although the mayor and city councilman denied any mention of the plaintiff during their meeting, the mayor "was impeached by his prior deposition testimony in which he stated that he may have spoken with [the city councilman] about [the plaintiff's] complaints prior to her transfer." *Id.* at 1163 n.12.

Unlike *Goldsmith*, there is zero evidence that any of the decisionmakers knew of Plaintiff's complaints. None of them have even hinted that they knew of Plaintiff's complaints. Chisolm testified that he "never had a formal conversation with" Hicks or had a conversation with Hicks about Plaintiff. (Doc. # 16-14 at 89:22-90:19). Simoes testified that he never knew Plaintiff complained to Hicks that she did not get promoted because she was a black woman, and that Plaintiff never communicated that belief to him. (Doc. # 16-38 at 78:13-79:2). Further,

Simoes testified that neither Hicks nor Oliver told him of Plaintiff's October 2023 complaints of discrimination. (*Id.* at 114:12-115:17; 133:7-20). Finally, Oliver testified that the only conversation she recalled having with Hicks about Plaintiff in June 2023 was regarding Plaintiff's performance. (Doc. # 16-2 at 22:1-23). Oliver further testified that she began assisting with Plaintiff's performance evaluations after Plaintiff complained to Hicks in October 2023, but Oliver did not understand what Plaintiff thought was "unfair" about her evaluations and did not have a conversation with her about it. (*Id.* at 34:17-35:13). Oliver was never shown a copy of the October 2023 email to Hicks and had "no knowledge of [Plaintiff] making a retaliation complaint." (*Id.* at 38:2-7; 74:12-23).

Plaintiff points to Vulcan's EEOC position statement to argue that Chisolm and Oliver were aware of her complaints. (Doc. # 21-2 at 6). The position statement states that in October 2023, after Plaintiff "complained to Hicks that she was being treated *unfairly*," "Hicks discussed this issue with [Plaintiff], Chisolm, . . . and Nichole Oliver, Director of Human Resources." (*Id.* (emphasis added)). At most, this statement suggests only that Plaintiff raised a generalized concern about unfair treatment, not that she complained of unlawful discrimination under either Title VII or § 1981, or that any such discrimination complaint was conveyed to Chisolm or Oliver. The court assumes that the position statement could be reduced to an admissible form at trial and that Hicks did discuss Plaintiff's "unfair" treatment with Chisolm and Oliver. But, "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice." *Byrne v. Ala. Alcoholic Bev. Control Bd.*, 635 F. Supp. 2d 1281, 1296 (M.D. Ala. 2009) (quoting *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995)). Accordingly, on the record before the court, no reasonable factfinder

could conclude that Chisolm, Simoes, and Oliver knew of Plaintiff's complaints of discrimination. *See Anderson*, 477 U.S. at 248.

### 4.    Whether the harassment well might have dissuaded a reasonable worker from engaging in protected activity

Finally, Plaintiff must establish that Vulcan's harassment well might have dissuaded a reasonable worker from engaging in protected activity. *Burlington Northern*, 548 U.S. at 68. Under the *Burlington Northern* standard, "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

Here, Plaintiff alleges that the unwelcome harassment included "a denial of a promotional opportunity in September 2023, a reduction in the scope of her job responsibilities, a failure to investigate her repeated complaints of discrimination, placement on a performance improvement plan and her eventual termination." (Doc. # 1 ¶¶ 47, 52). Even taking these allegations as true, a trier of fact could not reasonably infer that the challenged actions would have dissuaded a reasonable worker from engaging in protected activity because the employer's decisions were indisputably tied to documented concerns about Plaintiff's performance. (*See, e.g.*, 16-3 at 116:2-21, 121:8-17, 138:1-139:20, 156:7-158:6, 199:19-202:7, 276:3-10; 16-16; 16-23, 16-36; 21-6). In other words, the record evidence shows that these actions were not materially adverse retaliation but rather ordinary workplace responses to an employee who was not meeting job expectations. And, the alleged failure to investigate cannot support a retaliatory hostile work environment claim because Plaintiff has not presented any evidence to support that the lack of an investigation was directed at her or done for a retaliatory reason. *See Ayres v. City of Birmingham*, No. 2:24-CV-01055-RDP, 2025 WL 392720, at *3 (N.D. Ala. Feb. 4, 2025)

(citing *Entrekin v. City of Panama City Fla.*, 376 F. App'x 987, 995 (11th Cir. 2010)). Plaintiff has not plausibly shown she can satisfy this element.[4]

For all of the above reasons, Plaintiff cannot establish a prima facie case of retaliatory hostile work environment under either Title VII or § 1981. Defendant's Motion for Summary Judgment is due to be granted on these claims.

### B.    Plaintiff's Discriminatory Termination Claim under the ADEA

The Age Discrimination in Employment Act ("ADEA") prohibits an employer from discharging an employee who is at least forty years old because of that employee's age. *See* 29 U.S.C. §§ 623(a)(1), 631(a). The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail to or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Id.* at § 623(a)(1).

"A plaintiff in an ADEA claim may 'establish a claim of illegal age discrimination through either direct or circumstantial evidence.'" *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (quoting *Van Voorhis v. Hillsborough Cnty. Bd. of County Comm'rs*, 512 F.3d 1296, 1300 (2008)). The Eleventh Circuit defines direct evidence as "evidence, which if believed, proves [the] existence of fact in issue without inference or presumption.'" *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)). Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, constitute

---

[4] Additionally, there is the point made by a panel of our Circuit that if an employee files and pursues their discrimination complaint after the alleged harassment, the harassment did not dissuade that employee from making a charge of discrimination. *Tarmas v. Sec'y of Navy*, 433 F. App'x 754, 763 (11th Cir. 2011) (unpublished). Even after the alleged harassment occurred, Plaintiff testified that she complained to Hicks again in February 2024 (Doc. # 16-3 at 198:15-1199:6) and filed her EEOC charge in May 2024 (Doc. # 1-1). Thus, Plaintiff was not ultimately dissuaded from making a charge of discrimination. *Tarmas*, 433 F. App'x at 763.

direct evidence of discrimination. *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (citing *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988)). Comments and remarks that "merely refer[] to characteristics associated with increasing age, or facially neutral comments from which a plaintiff has inferred discriminatory intent, are not directly probative of discrimination." *Id.*

Meanwhile, "[c]ircumstantial evidence only suggests, but does not prove, a discriminatory motive." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921-22 (11th Cir. 2018) (Title VII case). This type of evidence can include suspicious timing, ambiguous statements, disparate treatment of similarly situated employees, or evidence that the employer's stated reason for the adverse action is pretextual. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733-34 (7th Cir. 2011)).

In employment discrimination cases, courts have historically applied the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973). However, the *McDonnell Douglas* framework is not the exclusive method for fending off summary judgment. *Ismael v. Roundtree*, 161 F.4th 752, 763-64 (11th Cir. 2025); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Even if a plaintiff cannot satisfy the *McDonnell Douglas* framework – or after the presumption it creates is rebutted – the court must still consider whether the record as a whole presents a "convincing mosaic" of circumstantial evidence from which a reasonable jury could infer intentional discrimination. *Id.*

As an initial matter, the court evaluates Plaintiff's argument that she has presented a direct evidence case of age discrimination. Next, the court assesses Plaintiff's claim under the *McDonnell Douglas* framework. It then considers, regardless of the outcome of that analysis,

whether the evidence collectively forms a convincing mosaic sufficient to create a genuine issue of material fact for trial.

### 1.    Direct Evidence

Plaintiff asserts she has presented a direct evidence case based on the October 13, 2023 comments of Chisolm. (Doc. # 22 at 25). After Plaintiff's meeting with Chisolm, Plaintiff emailed Hicks and said that Chisolm told her that her job was on the line and that there were other "older" procurement employees whose jobs were on the line because of their "old way of thinking." (Docs. # 16-3 at 208:13-209:22; 16-23). In his deposition, Chisolm did not recall making that statement; rather, he recalled "telling [Plaintiff] that the old way of thinking was problematic given Vulcan's recent changes in the Procurement Department." (Docs. # 16-14 at 105:12-106:13; 17 at 22). Vulcan contends that Chisolm's statements were referring to older employees by tenure at the company rather than older employees by age. (Doc. # 17 at 22).

Regardless of the parties' conflicting interpretions of Chisolm's statements, even viewed in the light most favorable to Plaintiff's position, they do not constitute direct evidence. Indeed, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, will constitute direct evidence." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Further, evidence that is "subject to more than one interpretation" is not direct evidence. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). Because Chisolm's statement is subject to multiple interpretations, Chisolm's statement is not direct evidence of age discrimination. *See id.*

Additionally, Chisolm's statements were made during a performance dialogue in October 2023, more than five months before Plaintiff was terminated in March 2024. Nor were they made in connection with the decision to terminate her employment. "Comments by a supervisor that are temporally remote from the challenged decision can hardly be direct evidence of

discrimination, since they require an inference of a general discriminatory attitude, followed by another inference that the attitude entered into the making of the challenged decision." *Allen v. City of Athens*, 937 F. Supp. 1531, 1543 (N.D. Ala. 1996); *see, e.g.*, *Armbruster v. Unisys Corp.*, 32 F.3d 768, 779 (3d Cir. 1994) (finding statement was temporally remote when there was a three-month gap between the statement and the challenged decision), *abrogated on other grounds by O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308 (1996). Because Chisolm's statements were temporally remote from Plaintiff's termination, and do not without inference establish an age-discriminatory motive, his statements cannot serve as direct evidence. *Id.*

Although Plaintiff does not have direct evidence of age discrimination, the court will evaluate Plaintiff's claim under *McDonnell Douglas* in light of the circumstantial evidence she has presented.

### 2. *McDonnell Douglas* Framework

Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of discrimination. 411 U.S. at 802. Once the plaintiff establishes her prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the defendant is unable to produce a legitimate, non-discriminatory reason, the defendant is not entitled to summary judgment. *Ismael v. Roundtree*, 2025 WL 3492930 at *8 (11th Cir. Dec. 5, 2025). However, if the defendant does successfully rebut the presumption of discrimination, the court evaluates whether there is either evidence of pretext or "whether 'the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination . . . by the decisionmaker.'" *Id.* (quoting *Smith*, 644 F.3d at 1328).

To establish an ADEA discrimination claim under *McDonnell Douglas*, Plaintiff must show that (1) she was a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to do the job, and (4) she was replaced by or otherwise lost a position to a "substantially younger" individual. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc); *Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872, 875 (11th Cir. 2013). Additionally, the Supreme Court has clarified that the ADEA's "because of" language imposes a but-for causation standard. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176-80 (2009). In other words, a plaintiff must prove that discrimination was the "but-for" cause of the adverse employment action. *Id.* The first two elements are not in dispute. That is, the record shows (1) Plaintiff, as an individual over the age of 40, is a member of a protected class under the ADEA, and that (2) Plaintiff was subjected to an adverse employment action when she was terminated.

As to the third element, the parties dispute whether Plaintiff was qualified to do her new job or, perhaps more precisely, whether she was adequately performing her job duties. And, as to the fourth element, in the Eleventh Circuit, "substantially younger" has been interpreted to mean three or more years younger. *See Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1390 (11th Cir. 1983) (affirming summary judgment in favor of employer where employee was replaced by someone two years younger). In 2024, Plaintiff was 59-years-old. When Plaintiff's territory was reduced, 63-year-old Ladair Tinker began handling the plants removed from Plaintiff's territory. (Docs. # 16-3 at 220:15-18; 16-11 ¶ 12). Tinker is older than Plaintiff and thus cannot be a "substantially younger" individual. (*Id.*). However, Chisolm was 51-years-old when he absorbed Plaintiff's plants after she was terminated at age 59 and is therefore "substantially younger" than Plaintiff.

*See Pace*, 701 F.2d at 1390. The court assumes without deciding that Plaintiff has established a prima facie case of age discrimination.

### a.    Pretext

The court begins with an analysis of whether Plaintiff has shown pretext. As to the third element of Plaintiff's ADEA claim, Plaintiff argues that Vulcan's decision to terminate her was pretextual because (1) her value-generation numbers in certain categories were higher than those of some other sourcing leads; (2) Chisolm was the subject of other complaints; (3) she was never informed that failing to meet any single item in the PIP would result in her termination; and (4) the employee assigned to assist her with the 7-step project did not provide the data she requested, and the project remained unfinished even after her termination. (Doc. # 22 at 23-24).

First, Plaintiff is correct that her value-generation numbers in two categories were higher than those of some other sourcing leads. (Doc. # 21-6). But, when reviewing Plaintiff's performance as a whole, Vulcan's metrics found that her performance was "far below" other senior team members. (*Id.*) Plaintiff's performance score was listed at 19%, the lowest of all senior team members; to be sure, the next lowest score was 69%, a 50-point gap. (*Id.*). This low score was driven largely by Plaintiff's poor ratings in behavioral and operational categories, such as credibility, reporting discipline, collaboration, analytics capability, and leadership of sourcing activities, which together accounted for a substantial portion of the overall evaluation. (Doc. # 16-38 at 166:9-173:14). Plaintiff was also repeatedly and consistently counseled on her performance for several months before her discharge. (*See, e.g.*, Docs. # 16-3 at 116:2-21, 121:8-17, 138:1-139:20, 156:7-158:6, 199:19-202:7, 276:3-10; 16-16; 16-23, 16-36; 21-6).

Second, Plaintiff points to purported concerns raised about Chisolm's performance. For example, Simoes testified that he had concerns about Chisolm's "relationship[s] within the

company," while also noting that negative feedback was common and that even Simoes himself received such criticism. (Doc. # 16-38 at 188:4-23). Simoes further clarified that this feedback was not specific to Chisolm but was instead "overall" feedback directed at the department. (*Id.*). Unlike Plaintiff, Chisolm was not placed on a PIP. (*Id.* at 191:1-2). But, regardless of whether complaints existed or whether they were directed at Chisolm specifically, Chisolm is not similarly situated to Plaintiff because he served as her supervisor. *See Mathis v. Wachovia Bank*, 255 F. App'x 425, 431 (11th Cir. 2007) (holding that bank teller and teller supervisor were not similarly situated); *Abram v. Von Maur, Inc.*, 719 F. App'x 929, 932 (11th Cir. 2018) (holding that employees with different positions were not similarly situated). Thus, any complaints about Chisolm are immaterial because he is not a proper comparator to Plaintiff.

Third, Plaintiff claims she was not *told* that failing to meet any single item in the PIP would result in termination. Nevertheless, the PIP plainly stated that "failure to improve within the specified areas up to an acceptable standard may lead to further corrective action." (Doc. # 16-26 at 4). Plaintiff signed immediately below that statement. (*Id.*). Accordingly, it was unnecessary that she receive more specific verbal notice because the PIP itself put Plaintiff on notice that insufficient improvement could result in additional discipline, including termination.

Fourth, it does not matter that the employee assigned to assist Plaintiff with the 7-step project did not provide the requested data. Although Plaintiff complained to Chisolm about the missing information, she did not independently obtain the data or otherwise ensure the project's completion. (Doc. # 16-3 at 180:9-181:17; 185:14-188:17). That was her responsibility. As the Sourcing Lead, Plaintiff remained ultimately responsible for the project, and she admitted she handled "most of" the work and the "vast majority" of the presentation. (Docs. # 16-1 at 85:8-21; 16-3 at 186:7-187:5; 16-33 ¶ 5). Moreover, this assignment was part of Plaintiff's PIP; she could

not reasonably have expected others to complete the work on her behalf. (*See* Doc. # 16-26). Because Plaintiff was ultimately responsible for the project and acknowledged that fact, this argument is without merit.

Also, it was up to Vulcan to decide whether to finish Plaintiff's 7-step project. Simoes testified that Plaintiff's 7-step project was not completed after Plaintiff's discharge because the employees involved left the company, the team was already fully loaded with higher-priority work, and the project was placed in a backlog pipeline without anyone available to take it over. (Doc. # 16-38 at 165:23-166:8). Plaintiff cannot establish pretext merely by disagreeing with or second-guessing Vulcan's operational decisions. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

Finally, even crediting Plaintiff's interpretation of Chisolm's statement, a single remark that could be viewed as reflecting age-related bias is not, by itself, sufficient to create a genuine dispute of material fact as to pretext or to defeat summary judgment, particularly where it was completely unrelated to and remote in time from her termination. *See, e.g.*, *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002) (holding that an isolated comment, unrelated to the decisional process, was insufficient to establish pretext); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) ("Although a comment unrelated to a termination decision may contribute to a circumstantial case for pretext, . . . it will usually not be sufficient absent some additional evidence supporting a finding of pretext.").

26

As the Eleventh Circuit has aptly stated, "[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)). In this case, Vulcan has demonstrated a legitimate, nondiscriminatory reason for Plaintiff's termination. Because Plaintiff cannot meet her burden under *McDonnell Douglas*, the court proceeds to the convincing mosaic standard.

### 3.    Convincing Mosaic Standard

The convincing mosaic standard states that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328. "[The Eleventh Circuit] has used the phrase 'convincing mosaic' simply to recognize that courts must consider the totality of a plaintiff's circumstantial evidence on summary judgment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action – the ultimate inquiry in a discrimination lawsuit." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). "That evidentiary picture may include, 'among other things,' (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342 (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)). Viewing the record evidence in the light most favorable to Plaintiff, that evidence does not satisfy any of these categories.

First, as to suspicious timing or ambiguous statements, Plaintiff's strongest evidence is the remark she attributes to Chisolm that her job was on the line and that other "older" procurement employees were at risk because of their "old way of thinking." (Docs. # 16-3 at 208:13-209:22; 16-23). Even crediting Plaintiff's version of the statement and construing "older" to refer to age rather than tenure, the comment was made more than five months before Plaintiff's March 2024 termination and during a performance discussion unrelated to her termination. There is no evidence of other or repeated age-related remarks, no evidence that Chisolm's comment was tied to the ultimate termination decision, and no evidence of close temporal proximity. A single, temporally remote, and facially ambiguous comment, particularly one susceptible to a non-age-based interpretation, does not create a reasonable inference that age was the but-for cause of Plaintiff's discharge. *See Gross*, 557 U.S. at 176-80.

Second, regarding systematically better treatment of similarly situated employees, Plaintiff makes two arguments: (1) that some sourcing leads had lower value-generation numbers in certain categories, and (2) that Chisolm himself was not placed on a PIP despite complaints about his performance. (Docs. # 16-38 at 188:4-23, 191:1-2; 21-6). The overall performance metrics show that Plaintiff's performance score was 19%, 50 points below the next lowest senior team member. (Doc. # 21-6). Plaintiff has not identified a substantially younger sourcing lead with comparable overall deficiencies who avoided discipline or termination. Nor is Chisolm a valid comparator, as he held a supervisory role and was not similarly situated in job duties or responsibilities. *See Mathis*, 255 F. App'x at 431; *Abram*, 719 F. App'x at 932.

Third, Plaintiff's reliance on the same arguments addressed under *McDonnell Douglas* – that her numbers were higher in certain areas, that she was not warned that failing any single PIP objective would result in termination, that the 7-steps project remained unfinished after her

discharge, and that Chisolm made an age-related comment – are unavailing. As discussed above, the record reflects months of documented counseling, objective metrics placing her well below peers, a written PIP expressly warning that failure to improve could lead to further corrective action, and Plaintiff's admitted responsibility for the 7-step project, which was itself part of her PIP. Disagreement with Vulcan's business judgment or with the weight assigned to various performance metrics does not demonstrate that its stated reason was dishonest or that age discrimination was the real reason she was terminated. *See Chapman*, 229 F.3d at 1030; *Elrod*, 939 F.2d at 1470.

Considering the totality of the Rule 56 evidence, Plaintiff's case amounts to a single ambiguous comment, generalized disagreement with performance evaluations, and the absence of a clearly comparable younger employee who was treated more favorably. That evidentiary picture does not permit a reasonable factfinder to conclude that age was the but-for cause of her termination. *See Gross*, 557 U.S. at 176-80; *Tynes*, 88 F.4th at 946. Accordingly, even evaluating her evidence under the convincing mosaic theory, Defendant is entitled to summary judgment.

## IV. Conclusion

For all of these reasons, Defendant's Motion for Summary Judgment (Doc. # 15) is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this March 3, 2026.

**R. DAVID PROCTOR**
SENIOR U.S. DISTRICT JUDGE